COMMONWEALTH vs. WARREN A. GIBSON.

Norfolk.   March 4, 1975. — August 22, 1975.

Present: TAURO, C.J., QUIRICO, BRAUCHER, HENNESSEY, & KAPLAN, JJ.

*Practice, Criminal,* Grand jury proceedings, Charge to jury.  *Grand Jury.   Evidence,* Hearsay, Of reputation.  *Homicide.*

There was no error in the denial of a motion to dismiss an indictment for murder based on the investigating police officer's recounting to the grand jury a statement to him by an eyewitness.  [522-525]

At a murder trial, there was no error in excluding testimony of the defendant on direct examination with respect to his knowledge of the victim's reputation for violence when drinking until a reasonable foundation for such testimony had been laid.  [525-527]

Considered as a whole, the charge in a murder case was proper even if a portion thereof on the drawing of inferences, taken alone, would have been improper.  [527-528]

Upon review of a capital case in which the defendant was convicted of murder in the first degree by shooting an acquaintance after they had been in a café and the defendant had stated his liking for shooting people, an argument that under G. L. c. 278, § 33E, this court should direct the entry of a verdict of manslaughter was not persuasive.  [528]

INDICTMENT found and returned in the Superior Court on June 4, 1973.

The case was tried before *Beaudreau,* J.

*Robert S. Potters* for the defendant.

*John P. Connor, Jr.,* Assistant District Attorney, for the Commonwealth.

QUIRICO, J.   This is an appeal under G. L. c. 278, §§ 33A-33G, by the defendant, who alleges that various errors of law were made in the course of the trial of an indictment charging him with the murder of John R. Shrake (victim).[1]   The jury convicted him of murder in

---

[1] The defendant was also tried and convicted at the same trial of unlawfully carrying a firearm.   This indictment was filed, and no appeal has been taken therefrom.

the first degree and the judge sentenced him to Massachusetts Correctional Institution at Walpole for the rest of his natural life. The defendant has assigned and argued as error the following actions of the trial judge: (1) the denial of the defendant's motion to dismiss the indictment, which motion was predicated on the fact that hearsay evidence was presented to the grand jury which returned the indictment; (2) the exclusion of a question by defense counsel and affirmative answer by the defendant as to whether the defendant had learned something with regard to the habits and character of the victim when the victim was drinking; and (3) the giving of an instruction to the jury that they might draw reasonable inferences from circumstantial evidence. The defendant further argues that the verdict of guilty of murder in the first degree was against the weight of the evidence and that, accordingly, we should exercise our power under G. L. c. 278, § 33E, to direct the entry of a verdict of guilty of manslaughter. There was no error of law and there was ample evidence to support the verdict. We summarize some of the evidence which, if believed, as it evidently was, supports the verdict.

At about 10:30 P.M. on May 28, 1973, the victim, accompanied by two other men, Ronald B. Casey, and Donald C. Keets, arrived at the Crossroads Cafe (café) in Weymouth, or South Weymouth. When they arrived there, the defendant was seated at a booth with Robert Burrill. The victim, Casey, and Keets sat at another booth. Burrill was repeatedly playing the same song on the jukebox, until the bartender became angry and shut the machine off. This displeased Burrill, who started to leave and to take the jukebox out with him. The bartender, however, stopped him from removing the machine and got him to leave without it. The defendant thereupon joined the victim, Casey, and Keets in their booth. All the men were known to each other. All had been drinking for some time, the other three for longer and in greater amounts than the defendant.

When the defendant joined the other three men he sat across the booth from the victim. The defendant and the victim apparently engaged in a boasting contest, each daring the other to rip the toilet seat or, "commode," out of the ladies' rest room. The defendant did remove the toilet seat, which he brought back to the table. The victim seems to have attempted to remove the toilet itself, but failed. Thereafter, the defendant and the victim continued challenging each other, with statements becoming progressively louder and more harassing. The defendant said, "I'm going to jail anyway," or, "I'm going to Walpole anyways tonight. I don't care."

Thereafter, the defendant turned the conversation to the subject of guns and the shooting of people. In the words of one witness, the defendant said "that he liked nothing better than to see a man grab his heart after he had been hit." In the words of a witness, the defendant "was showing . . . how people go through changes when they got shot in the heart . . . [and that] he would like to see the expressions on their face when they get shot through the heart." Another witness testified that the defendant said to the victim, "I would like to see a man go through changes when he gets busted in the heart."

The defendant himself testified that he had purchased a gun which he kept in the glove compartment of his car. He obtained no permit to carry the gun. At least once following the conversations described above, the defendant left the café to go to his car parked outside. After his return from the car, he brushed against Keets, who was standing at the bar. Keets "felt something kind of hard." Assuming the hard object was a gun, Keets "told him if he pulls his gun out here, that I would take it away from him and jam it up his . . .." The defendant responded, "Good, I have a cap for you, too."

At about 1 A.M. the café closed for the night. By this time, the victim, Casey, Keets, and the defendant had been joined by two other acquaintances, John Sprague and Frank Howlett. The defendant said to the victim,

"Come on, Jack. Come up to Kramer's." "Kramer's" is Kramer's Dairy Bar in South Weymouth. The victim was then apparently quite drunk, as he fell down in the parking lot outside the café. At Keets's urging, the victim got into Sprague's car, rather than into the defendant's car. Sprague and the victim were joined in Sprague's car by Howlett. Keets got into Casey's car. The defendant entered his own car alone. Sprague's car left first, followed by the defendant's car, and the two cars, Sprague's in front, drove to Kramer's. Casey's car did not follow. Sprague and Howlett dropped the victim off at Kramer's at about 1:15 A.M. Sprague testified that when he last saw the victim he was standing at Kramer's with the defendant and that no one else was present.

Precisely what then happened at Kramer's is now apparently known only to the defendant. A woman who lived directly across the street from Kramer's testified that around 1 A.M. she "heard a sound that sounded . . . like a pop. There was maybe two or three seconds and I heard another pop, and then I heard a car go down . . . the . . . street . . .. It passed my house." About 6:30 A.M., another woman who lived near Kramer's was leaving for work when she saw the body of a man lying on its back. She summoned help. About 6:40 A.M., a Weymouth police officer arrived and examined the body, observing that it had a blue tint to its skin and no pulse. The body was identified as that of the victim. An autopsy revealed two gunshot wounds. One bullet had entered the base of the right lower neck or the upper part of the back and passed through the neck, exiting on the left back side of the neck. The other bullet perforated the skin at the level of the right second rib, and from there entered the chest cavity, perforating the upper lobe of the right lung. It also completely disrupted and perforated the large artery called the aorta. This bullet, which came to rest in the victim's arm, was recovered. The physician who performed the autopsy expressed his opinion that this latter wound was the cause of death.

He also expressed his opinion, based on the level of alcohol in the victim's blood, that the victim was intoxicated at the time of his death.

Later, on the day of the shooting, the defendant appeared with counsel at the Weymouth police station. After the defendant received the warnings required to be given by *Miranda* v. *Arizona*, 384 U. S. 436, 478-479 (1966), his counsel gave the police a .38 caliber "Titan Tiger" revolver which the defendant stated was the gun used to kill the victim. A ballistics test later confirmed that the fatal bullet was fired from this weapon. During this visit to the police station, the defendant gave his account of the events leading up to the shooting. He recounted the events at the café rather differently from the way summarized above. He claimed that he was on his way to the home of his wife, from whom he was separated, to visit his children when Sprague, who was behind him in another car, blew his horn causing him to pull into Kramer's. Thereupon, alleged the defendant, the victim and another unidentified man came up to him and the victim "called him a . . . [vile name] and stated to . . . [the defendant] he was going to F him up." Then, according to this statement, the victim, still swearing, approached to within a few inches of the defendant until the unknown third person stated, "Let's." The defendant allegedly then pulled out his gun, which he had placed in his belt merely so as not to forget it, and, thinking the victim had a knife, fired the gun without aiming it. According to this statement, the victim and the unknown third person just walked away. The defendant then drove away, reporting the incident to the police later when he first realized that the victim had been seriously injured.

The defendant repeated substantially the foregoing story in his testimony at the trial. The jury obviously disbelieved it.

1. The defendant's first and apparently main argument is that the trial judge erred in denying his motion to

dismiss the indictment, which motion was predicated on the fact that hearsay evidence was presented to the grand jury which returned the indictment. The only witness called before the grand jury was the investigating police officer. This officer testified to his own observations at the scene of the crime and at the autopsy, and detailed the admissions made to him by the defendant in the presence of counsel. All this evidence would seemingly be admissible at a trial. The hearsay question is apparently raised, however, because the police officer recounted to the grand jury a statement about some of the events prior to the shooting given him by one of the witnesses thereto. Even assuming that the grand jury would not have returned a murder indictment without this hearsay evidence, an assumption which is by no means compelled, we hold that there was no error in denying the motion to dismiss the indictment.

In *Costello* v. *United States,* 350 U. S. 359 (1956), the United States Supreme Court answered in the affirmative the question: "May a defendant be required to stand trial and a conviction be sustained where only hearsay evidence was presented to the grand jury which indicted him?" The court rejected the argument that an indictment based solely on hearsay should be invalidated in Federal criminal cases, either as matter of constitutional law or as matter of policy set down under the court's power of superintendence over lower Federal Courts. *Id.* at 361-364. As to the constitutional argument, the court said: "[N]either the Fifth Amendment nor any other constitutional provision prescribes the kind of evidence upon which grand juries must act. . . . There is every reason to believe that our constitutional grand jury was intended to operate substantially like its English progenitor. . . . Grand jurors were selected from the body of the people and their work was not hampered by rigid procedural or evidential rules. In fact, grand jurors could act on their own knowledge and were free to make their presentments or indictments on such informa-

tion as they deemed satisfactory. . . . An indictment returned by a legally constituted and unbiased grand jury . . . is enough to call for trial of the charge on the merits. The Fifth Amendment requires nothing more." *Id.* at 362-363.

As to the policy argument, the court said: "No persuasive reasons are advanced for establishing . . . a rule [permitting defendants to challenge indictments on the ground that they are not supported by adequate or competent evidence]. It would run counter to the whole history of the grand jury institution, in which laymen conduct their inquiries unfettered by technical rules. Neither justice nor the concept of a fair trial requires such a change. In a trial on the merits, defendants are entitled to a strict observation of all the rules designed to bring about a fair verdict. Defendants are not entitled, however, to a rule which would result in interminable delay but add nothing to the assurance of a fair trial." *Id.* at 364.

Many of our own cases have reached the same result as the *Costello* case. See, for example, *Commonwealth* v. *Woodward,* 157 Mass. 516, 519 (1893); *Commonwealth* v. *Walsh,* 255 Mass. 317, 318-319 (1926); *Commonwealth* v. *Ventura,* 294 Mass. 113, 119-121 (1936); *Commonwealth* v. *Lammi,* 310 Mass. 159, 163 (1941); *Commonwealth* v. *Geagan,* 339 Mass. 487, 499 (1959), cert. den. 361 U. S. 895 (1959); *Commonwealth* v. *Monahan,* 349 Mass. 139, 154-156 (1965); *Commonwealth* v. *Beneficial Fin. Co.* 360 Mass. 188, 229-231 (1971), cert. den. sub nom. *Farrell* v. *Massachusetts,* 407 U. S. 910 (1972), and sub nom. *Beneficial Fin. Co.* v. *Massachusetts,* 407 U. S. 914 (1972). See also *Commonwealth* v. *Lincoln, ante,* 281, 285, n. 2 (1975). The United States Supreme Court apparently continues to view *Costello* as correct in its reasoning and in its holding: "A grand jury has broad investigative powers to determine whether a crime has been committed and who has committed it. The jurors may act on tips, rumors, evidence offered by

the prosecutor, or their own personal knowledge." *United States* v. *Dionisio*, 410 U. S. 1, 15 (1973). See *Branzburg* v. *Hayes*, 408 U. S. 665, 701 (1972); *United States* v. *Calandra*, 414 U. S. 338, 342-346 (1974). See also Federal Rules of Evidence, Rule 1101 (a) (2), 28 U. S. C. App. (Supp. V, 1975) (as enacted by P. L. 93-595, January 2, 1975, effective July 1, 1975). The current law on this subject is reviewed to some degree in *United States* v. *Cruz*, 478 F. 2d 408 (5th Cir. 1973), cert. den. sub nom. *Aleman* v. *United States*, 414 U. S. 910 (1973). In that case the court stated: "In the absence of some showing that the integrity of grand jury proceedings has been impaired, an indictment even if based exclusively on . . . [hearsay] testimony will not be overturned on appeal." *Id.* at 411. We adhere to the views expressed in the above cases and hold that the trial judge did not err in denying the motion to dismiss the indictment.[2]

2. In the transcript of defense counsel's direct examination of the defendant, the following appears: Q. "Well, as a result of a conversation that you heard and talked with . . . [the victim's] friends, did you learn something, yes or no?" A. "Yes." Q. "And did you learn something with reference to . . . [the victim's] habits and character . . . at the time he was drinking, yes or no? A. "Yes." At this point the assistant district attorney objected and the judge ruled, "I will exclude that." Defense counsel took no exception to this ruling. Neither did he make an offer of proof.

"It is settled that an assignment of error under G. L. c. 278, §§ 33A-33G, brings nothing to this court unless

---

[2] Nothing in the holdings of *Myers* v. *Commonwealth*, 363 Mass. 843 (1973), or *Corey* v. *Commonwealth*, 364 Mass. 137 (1973), is to the contrary. In *Myers*, we held that G. L. c. 276, § 38, grants a defendant at a probable cause hearing the right to present his own witnesses and to cross-examine prosecution witnesses. *Id.* at 845-850, 855-856. In *Corey*, we held that G. L. c. 218, § 30, and c. 276, § 42, granted similar rights to defendants at bind-over hearings. The

based on a valid exception." *Commonwealth* v. *Chapman,* 345 Mass. 251, 255-256 (1962). *Commonwealth* v. *Roy,* 349 Mass. 224, 231 (1965). *Commonwealth* v. *Myers,* 356 Mass. 343, 346 (1969). *Commonwealth* v. *Underwood,* 358 Mass. 506, 509-510 (1970). *Commonwealth* v. *Lauria,* 359 Mass. 168, 172 (1971). *Commonwealth* v. *Zion,* 359 Mass. 559, 564 (1971). In any event, we note that there was no apparent error in excluding the proffered question and answer on the ground that no proper foundation had yet been laid for that line of inquiry. The defendant had a right to show that he acted in self-defense or upon mitigating provocation when he shot the victim, and to that end he had a right to introduce evidence that he was apprehensive for his own safety at the time of the shooting because of his knowledge of the victim's reputation as a violent or quarrelsome person. *Commonwealth* v. *Tircinski,* 189 Mass. 257, 258 (1905). *Commonwealth* v. *Rubin,* 318 Mass. 587, 588 (1945). *Commonwealth* v. *Connolly,* 356 Mass. 617, 625-626 (1970). But the judge is

---

statutes construed in *Myers* and *Corey* have no bearing on proceedings before a grand jury.

It is true that *Myers* contained dictum discussing the possibility that if the statute in question were interpreted other than in accordance with its clear and express language it might produce a violation of the Fourteenth Amendment to the Constitution of the United States. See *Myers* v. *Commonwealth, supra,* at 858 (Quirico, J., concurring in the result). But even this dictum was predicated on our prior holding that a probable cause hearing in this Commonwealth is a "critical stage" of a criminal proceeding. *Myers* v. *Commonwealth, supra,* at 848, 854-856. See *Commonwealth* v. *Britt,* 362 Mass. 325, 330-331 (1972). Since a grand jury proceeding is secret and nonadversary in nature, see, generally, Smith, Criminal Practice and Procedure, §§ 782, 805-823 (1970 and Supp. 1975), it cannot be termed a "critical stage" in the prosecution so as to require that a person under investigation be granted the right to counsel, to present witnesses, to cross-examine adverse witnesses, or even to be present. *United States* v. *Calandra,* 414 U. S. 338, 343-346 (1974). *Gerstein* v. *Pugh,* 420 U. S. 103, 122-123 (1975). *Foley* v. *Commonwealth,* 310 F. Supp. 1330, 1331 (D. Mass. 1970), and cases there cited. In sum, *Myers* and *Corey* have no relevance to grand jury proceedings.

permitted discretion in requiring that a reasonable foundation be laid for the asking of such questions. *Commonwealth* v. *Belton*, 352 Mass. 263, 269 (1967). At the time the question and answer at issue were excluded, the defendant had not yet testified that he was afraid of the victim, or even that the victim had accosted him. Defense counsel apparently recognized this problem, and took no exception, directing the defendant's testimony instead to the events at Kramer's. After the foundation had thus been laid, defense counsel returned to the subject of the defendant's knowledge of the victim's reputation for violence and was allowed by the judge to pursue it over objection from the assistant district attorney. The judge did not err in following this course. Cf. *Commonwealth* v. *Edmonds*, 365 Mass. 496, 503-504 (1974).

3. The defendant next assigns and argues as error the trial judge's inclusion of the following passage in his instructions to the jury: "An inference is properly drawn when, according to the experience of mankind, that is, your own experience, the existence of one fact logically and ordinarily follows from the existence of another fact. It is enough that the inferences drawn by a jury are reasonable although they are not the only inferences that can be drawn." The defendant took no exception to the giving of this instruction. As we have noted above, this means that this issue is not properly before us. Nevertheless, we note that the argument that this portion of the instructions deprived the defendant of his constitutional right to have all necessary elements of the offense proved beyond a reasonable doubt, *In re Winship*, 397 U. S. 358, 364 (1970), is without merit. The quoted passage, even assuming it would have been improper taken alone, was both preceded and followed by clear instructions impressing on the jury their duty to find the defendant not guilty if there remained in the minds of the jurors any reasonable doubt of the existence of any fact which was essential to the guilt of the defendant. A

jury charge must be considered as a whole, not by bits and pieces. *Commonwealth* v. *Shea,* 323 Mass. 406, 416 (1948). *Commonwealth* v. *Greenberg,* 339 Mass. 557, 585 (1959). *Commonwealth* v. *Kelley,* 359 Mass. 77, 92 (1971). Considered as a whole, the charge in this case was proper. Once the trial judge gave an adequate and accurate charge on the Commonwealth's burden of proof, "he was not required to repeat the same instruction with each of the other subjects discussed in the remainder of his charge." *Commonwealth* v. *Redmond,* 357 Mass. 333, 342 (1970).

4. In accordance with our duty under G. L. c. 278, § 33E, we have considered the whole case on the law and the evidence, and we are satisfied that the evidence amply supported the verdict, that there was no miscarriage of justice, and that this is not an appropriate case in which to order a new trial or direct the entry of a verdict of a lesser degree of guilt.

*Judgment affirmed.*