COMMONWEALTH vs. RONALD ST. PIERRE
(and three companion cases[1]).

Norfolk. December 4, 1978. — March 30, 1979.

Present: HENNESSEY, C.J., BRAUCHER, KAPLAN, LIACOS, & ABRAMS, JJ.

*Practice, Criminal,* Indictment, Grand jury proceeding, Access to wit-
nesses, Duplicitous charges, Comment by prosecutor. *Constitution-
al Law,* Access to witnesses. *Evidence,* Extrinsic evidence of prior
inconsistent statement, Prior conviction, Surrebuttal.

The fact that indictments were based entirely on hearsay did not
require their dismissal where there was no showing that the integ-
rity of the grand jury proceedings was impaired. [654-657]
Where defense counsel, after moving to dismiss indictments because
an investigating police officer had instructed five potential wit-
nesses not to talk to defense counsel, failed to suggest the correct
procedure as outlined in *Commonwealth* v. *Balliro,* 349 Mass. 505
(1965), for remedying the officer's actions and where any prejudice
to the defense as a result of the witnesses' subsequent refusal to
speak to defense counsel was minimal, the judge's delegating to the
prosecutor the responsibility to inform the witnesses of their right
to talk to counsel if they wished did not amount to reversible error.
[657-661]
This court did not consider the defendant's argument that indictments
for mayhem and assault and battery by means of a dangerous weap-
on were duplicative where the judge imposed concurrent sentences
of the same duration for each charge. [661-663]
The defendants in a criminal case were not prejudiced by the exclusion
of extrinsic evidence of a prior inconsistent statement of a witness
where the inconsistencies were already apparent. [663-664]
Impeachment of a witness by records of prior convictions was com-
plete on reading the records and establishing that the witness was
the subject of them, and a judge was not obliged to admit the records
as exhibits. [664]

---

[1] One against Ronald St. Pierre and two against Bobby Ray Kines.

This court declined to interfere on appellate review with a judge's exercise of discretion in refusing surrebutter for purposes of corroboration. [664-665]

Considered in the context of the prosecutor's entire argument, certain comments which brought the prosecutor's credit into the balance in attacking a defense hypothesis did not constitute reversible error. [665]

INDICTMENTS found and returned in the Superior Court on November 24, 1976.

Pretrial motions were heard by *Dwyer*, J., and the cases were tried before *Irwin*, J.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Robert Sheketoff (Bernard Grossberg & Joyce Perkit Zalkind* with him) for the defendants.

*Louis Sobadini*, Assistant District Attorney, for the Commonwealth.

KAPLAN, J. The defendants St. Pierre and Kines, inmates held in block 10 (the segregation unit) of the Massachusetts Correctional Institution at Walpole, after joint trial to a Norfolk County jury were convicted of the crimes of mayhem and assault and battery by means of a dangerous weapon, committed by them while incarcerated. Each was sentenced to concurrent three-to-ten year terms to be served at Walpole after sentences previously imposed. On their present appeals pursuant to G. L. c. 278, §§ 33A-33G, the defendants press three principal alleged errors: failure to dismiss the indictments as having been based entirely on hearsay; failure to remedy an improper admonition by an investigating police officer to five correction officers, potential witnesses, not to talk to defense counsel; and failure to order the Commonwealth to "elect" between indictments. In addition, error is claimed in four rulings responsive to particular issues arising during the trial. For the reasons to be stated we affirm the convictions.

Shortly before 2 P.M. on August 24, 1976, William Reilly, occupying one of the fifteen cells on tier 1 of block 10, suffered severe injury when the open solid steel outer door of his cell was slammed against his left arm extended through the locked inner grille door. Reilly was taken to Norwood Hospital, then transferred to Lemuel Shattuck Hospital where he underwent an operation. Two days later, August 26, he gave a written statement (dated August 25) to the investigating officer, State Trooper John P. Nasuti, which, combined with his photographic identifications made on August 25,[2] pointed to the defendants—two of the three inmates out of their cells and in the corridor at the critical time — as the men who had assaulted him by means of the door.

Trooper Nasuti prepared a report based on the information he received from Reilly and several correction officers who had been on duty on the day of the injury, as well as on his examination of the scene and of official documents at the prison. (Statements of the officers were not reduced to writing in discoverable form.)

In presenting evidence to the grand jury on November 23, 1976 (there was no probable cause hearing), the prosecutor offered only State Trooper Francis McDermott, who testified by referring to Trooper Nasuti's report; there was no direct testimony. Indictments were returned on November 24 and were attacked pretrial, unsuccessfully, on the hearsay ground mentioned.

When defense counsel attempted to interview the five correction officers who were potential witnesses in the case — Thomas Geiss, Thomas St. Pierre (not related to the defendant), Frank Millet, John Sullivan, and John

[2] These identifications were challenged by motions to suppress on which a hearing was held before the trial proper. The challenge failed. Review on that point is not sought here.

Reilly had been moved to block 10 the day before the injury and there was some question about his prior acquaintance with the defendant St. Pierre. Reilly knew the defendant Kines from the Charles Street jail.

McGrath — counsel learned that Trooper Nasuti had instructed the officers to refuse any conversation.[3] Counsel thereupon moved pretrial to dismiss the indictments. Denying the motion, the judge instructed the prosecutor to inform the guards, on the judge's authority, of their "right to talk to defense counsel as they wish or not wish." The prosecutor later reported that he had given the instruction. But the correction officers still declined to speak with counsel. Counsel then moved "for an Order requesting the Commonwealth to tell them to speak to us." The judge denied this motion also, stating that he saw "no need of taking further action."

At trial lasting seven days between July 21 and August 1, 1977, the prosecution called eight witnesses: the five correction officers, the victim Reilly, a medical expert, and Trooper Nasuti. Only Reilly identified Kines and St. Pierre as his assailants. He testified that Kines on the day, between 1 and 1:45 P.M., had come to his cell three times to talk to him. (Other testimony suggested that Kines was in the corridor for exercise and shower.) Kines asked to see a watch or a scar on Reilly's left hand. (Reilly was not clear what, precisely, Kines asked.) As Reilly put his hand through the grille, Kines seized it and pulled Reilly's arm out full length. Immediately St. Pierre who, according to Reilly, had been leaning against the opposite wall of the corridor (he was in the corridor to do a painting job), took and slammed the outer door on the arm four times, breaking both bones of the forearm.

The prosecution's theory was that Reilly was punished by Kines and St. Pierre for being a stool pigeon. This gained inferential support from testimony by Reilly that as he was assaulted about 1:45 P.M. the volume of the TVs and radios on the corridor increased (two of the guards, Geiss and St. Pierre, heard such a noise), which suggested

---

[3] The possibility that counsel had previously talked to one or more of these men is not absolutely excluded by the record, but no point is made of this.

a plan by the defendants, joined in by others, to drown out the victim's cries.

The defense presented nine witnesses—eight inmates and one correction officer (the latter, not assigned to block 10, was called to impeach Reilly's testimony that he had not known St. Pierre before the episode). The last inmate witness, Gordon O'Brien, had been a "runner" on the corridor (out of cell to perform certain duties) on the day of the crime. The defense tried to show circumstantially that O'Brien, at Reilly's request, had slammed the door on his arm so that Reilly could get out of the segregation unit. Alternatively the defense tried to suggest that Reilly had inflicted the injury on himself for the same purpose by pulling with his right hand on a length of cloth attached to the steel door and shutting the door on his left arm.

At the close of the evidence the defense, renewing a motion made and reserved pretrial, asked for an order requiring the Commonwealth to choose between the mayhem and assault and battery charges on the ground that they were harassingly similar or duplicative. The motion was denied. Motions for directed verdicts were renewed and denied but the relevant assignments of error have been abandoned and the sufficiency of the evidence to support the verdicts is not questioned.

We take up now the three errors adumbrated in the foregoing summary statement, adding further facts as they appear pertinent to each of these matters.

1. *Indictments based on hearsay.* Trooper McDermott, the witness heard by the grand jury, had, as far as appears, no personal connection with the case, not even as an investigator. He was a conduit for a police report itself composed of hearsay. The jurors could not usefully have put questions to McDermott, as they might have done to Trooper Nasuti if he had testified.[4] This court has held,

---

[4] It is perhaps worth noting that at certain points the account given the grand jury diverged from the testimony given at trial, most signifi-

however, that it is not enough to justify dismissal of an indictment that the jurors received hearsay or hearsay exclusively, and this is so even when better testimony was available for presentation to the grand jury. See *Commonwealth* v. *Robinson*, 373 Mass. 591, 592 (1977); *Commonwealth* v. *Walsh*, 255 Mass. 317, 319 (1926); *Costello* v. *United States*, 350 U.S. 359 (1956). The cases have not suggested a distinction between the hearsay offered by a witness in the position of McDermott, and the milder hearsay offered by one closer to the scene like Trooper Nasuti.

However, there is agreement that an indictment should be dismissed on a showing that "the integrity of grand jury proceedings has been impaired" (see *Commonwealth* v. *Gibson*, 368 Mass. 518, 525 [1975], quoting from *United States* v. *Cruz*, 478 F.2d 408, 411 [5th Cir.], cert. denied sub nom. *Aleman* v. *United States*, 414 U.S. 910 [1973]). The defendants invite our attention to *United States* v. *Estepa*, 471 F.2d 1132, 1137 (2d Cir. 1972), which suggests that an indictment based on hearsay should be dismissed where the prosecutor "deceive[d] grand jurors as to 'the shoddy merchandise they [were] getting'" (quoting from *United States* v. *Payton*, 363 F.2d 996, 1000 [2d Cir.], cert. denied, 385 U.S. 993 [1966] [Friendly, J., dissenting]). That would be a case where the integrity of the grand jury was impaired. But in the present case there is no intimation that the prosecutor claimed for McDermott's testimony anything more than it was— remote hearsay.

We do not depart from the view that an indictment may stand which is based in part or altogether on hearsay. This proposition is adopted by Mass. R. Crim. P. 4(c) (to go into effect on July 1, 1979).[5] We have, however,

_____

cantly on the issue of when a photograph of Kines was first shown to Reilly.

[5] "Indictment Based Upon Secondary Evidence. An indictment shall not be dismissed on the grounds that the evidence presented before the

heretofore stressed our position — and do so again—that sound policy dictates a preference for the use of direct testimony before grand juries. See *Commonwealth* v. *Lincoln*, 368 Mass. 281, 285 n.2 (1975). We have also indicated that dependence on hearsay testimony might in "extraordinary circumstances" render an indictment vulnerable. *Commonwealth* v. *Comins*, 371 Mass. 222, 224 (1976), cert. denied, 430 U.S. 946 (1977). We raise the question whether that point is not reached when the testimony fails to attain to the level of the "probable cause" needed to support an arrest or search warrant (see *Commonwealth* v. *Stevens*, 362 Mass. 24, 26 [1972]).[6] Although it is not an objection to a warrant merely that it has issued on the basis of hearsay, the credit reasonably attaching to particular hearsay may fall so low as to invalidate a warrant (see 1 W.R. LaFave, Search and Seizure § 3.2, at 469-470 [1978]). Similar reasoning could be applied to indictments.[7] We raise, but do not answer the question posed, because in the present case, on examination of the grand jury testimony of Trooper McDermott, we think it does meet, in its detail and circumstantiality, a standard com-

grand jury consisted in whole or in part of the record from the defendant's probable cause hearing or that other hearsay evidence was presented before the grant jury."

[6] This standard, of course, is lower than that required under *Myers* v. *Commonwealth*, 363 Mass. 843, 848-850 (1973), or *Corey* v. *Commonwealth*, 364 Mass. 137, 141-142 (1973), for probable cause hearings in District Court which may precede indictment. That procedure does not partake of the history of the grand jury with its ex parte character merging investigatory and accusatory roles. See *Commonwealth* v. *Gibson*, 368 Mass. 518, 525 n.2 (1975).

That it is unprofessional conduct for a prosecutor to press criminal charges when he knows they are not supported by probable cause, see S.J.C. Rule 3:22A, PF 6, *post* 925 (1979). See also ABA Code of Professional Responsibility DR 7-103(A) (1969); ABA Standards Relating to the Prosecution Function § 3.9 (Approved Draft 1971); *United States* v. *Lovasco*, 431 U.S. 783, 790-791 (1977).

[7] The usual occasion for the application of the suggested standard would be in the appraisal of hearsay, but it might also be relevant to indictments based in part or as a whole on other testimony.

parable to that which applies in testing the basis of arrest and search warrants. We note that such a standard is modest when seen in relation to requirements imposed in other jurisdictions.[8]

We shall go on in the next point of this opinion to consider whether a deliberate withholding from the grand jury of direct evidence may, when combined with other deliberate prosecutorial tactics, also produce "extraordinary circumstances" (*Comins, supra* at 224) that would entitle the defense to some corrective action.

2. *Access to Commonwealth witnesses.* Trooper Nasuti's instruction to the five correction officers was offensive to the doctrine of *Commonwalth* v. *Balliro*, 349 Mass. 505 (1965), that "[w]itnesses belong neither to the Commonwealth nor to the defense . . . and should be available to

---

[8] There are jurisdictions which limit the evidence that may be presented to a grand jury to that admissible according to the rules of evidence (usually with some exceptions). But the limitation is ordinarily interpreted as directory only, and indictments will not be dismissed if there was sufficient competent evidence to support them: the level of sufficiency is sometimes stated in terms of probable cause to stand trial, and sometimes left less precise. See Cal. Penal Code Ann. § 939.6(b) (Deering 1971); Minn. R. Crim. P. 17.06 2(1)(a), 18.06 (1978); Nev. Rev. Stat. §§ 172.135, 172.155 (1975); N.Y. Crim. P. Law §§ 190.30(1), 210.20(1)(b) (McKinney 1971); Note, The Rules of Evidence as a Factor in Probable Cause in Grand Jury Proceedings and Preliminary Examinations, 1963 Wash. U.L.Q. 102, 111-115. Some States, while not restricting the evidence admissible before grand juries, apply to indictments the standard of sufficiency demanded in such probable cause hearings. See Idaho Code § 19-1107 (1948); Iowa R. Crim. P. 4(3) (1978); Mont. Rev. Codes § 95-1408(3) (Cum. Supp. 1977); N.D. Cent. Code § 29-10.1-33 (1974). The Model Code of Pre-Arraignment Procedure §§ 340.5, 330.5 (1975), likewise proposes that indictments attain that level of evidentiary sufficiency. In California it has been held by reference to the State Constitution that an accused is entitled to a probable cause hearing even when an indictment has been returned. *Hawkins* v. *Superior Court*, 22 Cal. 3d 584 (1978). See also *People* v. *Duncan*, 388 Mich. 489, 502 (1972) (reaching same result under supervisory power).

The question whether a standard should be articulated, and if so, what it should be, appears a proper subject for consideration by the standing Advisory Committee on Rules of Criminal Procedure soon to be appointed by this court.

both parties in the preparation of their cases." *Id.* at 516.
Witnesses may decline of their own will to talk to either
side or to both; but their choice should not be constrained,
and when it is the State that interferes, we consider the
vice to be constitutional, as indicated by our reference in
*Balliro* to art. 12 of our Declaration of Rights. See also
*United States* v. *Murray*, 492 F.2d 178, 194-195 (9th Cir.
1973), cert. denied sub nom. *Roberts* v. *United States*, 419
U.S. 854 (1974), and, generally, Annot., 14 A.L.R.3d 652
(1967). Cf. *Dennis* v. *United States*, 384 U.S. 855, 873
(1966). That the witnesses were employees of the State
was an aggravating factor in the present case, as they
might have felt a peculiar duty or pressure to act as the
investigating officer first directed. The correct procedure
for breach of the *Balliro* principle was for counsel to ask
the judge to bring the witnesses before him, and to have
him explain in some detail, on the record, the basis and
dimensions of the principle, and then to make sure that
counsel were given access to the witnesses on neutral
ground without any overshadowing influence. See *Commonwealth* v. *Carita*, 356 Mass. 132, 142-143 (1969).[9]

Counsel here, however, after moving to dismiss the indictments, did not suggest the correct course when the
judge delegated to the prosecutor the responsibility for
enlightening the witnesses: surely this was not an equivalent to an instruction by the judge himself. When the
witnesses remained negative after the prosecutor spoke
to them (we do not know in what terms exactly), counsel
still failed to ask for direct intercession by the judge, but
demanded that "the Commonwealth" should "tell them"
to speak to counsel — the wrong agent and the wrong
message.

---

[9] See also *Commonwealth* v. *French*, 357 Mass. 356, 399 (1970), judgments vacated as to death penalty sub nom. *Limone* v. *Massachusetts*,
4 U.S. 936 (1972); *Commonwealth* v. *Doherty*, 353 Mass. 197, 210-211
(1967), cert. denied, 390 U.S. 982 (1968); *Commonwealth* v. *McLaughlin*, 352 Mass. 218, 224, cert. denied, 389 U.S. 916 (1967).

Counsel were thus at fault; but if we should assume, nevertheless, that the judge was not relieved of a duty to take the matter in charge himself, and failed in that duty, then the following considerations apply. Such a breach may go so far as to be on its face fatal. See *Commonwealth* v. *Balliro, supra* at 517-518. Cf. *Commonwealth* v. *Johnson*, 365 Mass. 534, 547 (1974); *Commonwealth* v. *Ennis*, 1 Mass. App. Ct. 499, 504 (1973). We do not think this is such a case. See *Commonwealth* v. *Flynn*, 362 Mass. 455, 461 (1972); *Commonwealth* v. *Doherty*, 353 Mass. 197, 211 (1967), cert. denied, 390 U.S. 982 (1968); *State* v. *Lerner*, 112 R.I. 62, 76-78 (1973). Yet considering not only the high value of the *Balliro* principle but also the obvious difficulty in tracing the effects of a violation, we should be wary of concluding too readily that a defendant did not suffer prejudice. It seems fair to ask in the present case what advantage the defense might have got from pretrial conversations with the five guards in which the guards would speak with candor, and to make no discount for the likelihood that, even without any instruction from Trooper Nasuti, they would have refused to communicate with the defense.

The projection thus called for is difficult, but an examination of the whole record is quite persuasive that direct access to the guards during the preparations for trial would have added only negligibly, if at all, to the defense artillery trained toward trial. The grand jury minutes and Trooper Nasuti's report had been the subjects of discovery, from which the defense learned that the guards were not eyewitnesses but that one of them (Geiss) stationed outside the tier had heard the volume of TV and radio noises go up. (At trial, a second officer, St. Pierre, corroborated this; he was not mentioned at the grand jury.) The defense also had the benefit of a suppression hearing (see note 2, *supra*), and, according to an affidavit of counsel, had gathered information from correction officers and inmates (unnamed). From these sources they had a good basis for verifying or questioning testimony of

the five guards. The actual testimony at trial confirmed that none of the guards was in, or in sight of, the corridor when the episode occurred. The step-up of noise apparently did not energize the guards who heard it to quick action, and there was a lapse of some five to fifteen minutes from Reilly's injury to the arrival of the first of the guards (Geiss) at his cell.[10] Three guards (Geiss, St. Pierre, and Millet) had something to say about the positions and activity of the defendants and O'Brien as they first observed them in the corridor, and this might bear on the participation of the three men in the crime alleged; but the importance of the guards' testimony is diiminished here because of the interval of time mentioned.[11] Two of the guards (Sullivan and McGrath) had only a collateral role in the entire event. The cross-examination of the guards appears to have been thorough.

Thus we hold that any prejudice was minimal and any error not a ground for reversal. Reviewing the pretrial procedures as a whole, however, we see a potentiality for unfairness which would need correction if realized in practice. The rules of the *Stewart* and *Lewinski* cases[12] broadly entitle a defendant, in aid of trial preparation, to secure discovery from the Commonwealth of relevant grand jury minutes and statements of prosecution witnesses. These sources are particularly important when the witnesses will not speak with defense counsel. But a prosecutor can subvert the discovery by omitting probable cause proceedings, offering only hearsay materials (and those at a double remove) to the grand jury, and refraining from memorializing the statements of impor-

---

[10] Geiss put the interval at five minutes, Reilly at fifteen.

[11] The defense was assisted by Geiss's testimony that when he first saw Kines, Kines was wearing only a towel, lending some support to the proposition that Kines was in the shower when the steel door was moved, as the testimony of several inmates suggested, and as inmate O'Brien asserted.

[12] *Commowealth* v. *Stewart*, 365 Mass. 99 (1974). *Commonwealth* v. *Lewinski*, 367 Mass. 889 (1975).

tant witnesses. When such negative steps are taken with a deliberate view to handicapping the defense, we think a court on a proper pretrial application and demonstration of need would be justified in taking corrective measures which could include, for example, dismissal of the indictment without prejudice to the procuring of a fresh indictment on better evidence.[13]

3. *A question of duplicative charges.* The indictments for mayhem tracked the first branch of the statute (G. L. c. 265, § 14[14]) in alleging that the defendants "with malicious intent to maim and disfigure, did disable the left arm of one William Reilly"; the indictments for the assault and battery carried the familiar language (G. L. c. 265, § 15A) "by means of a dangerous weapon ... did

---

[13] It may be noted here that some jurisdictions make general provision for discovery by defendants in criminal cases by means of depositions of witnesses (rights of the prosecution vary). See Fla. R. Crim. P. 3.220(d) (1979); Ind. Code Ann. § 35-1-31-8 (Burns 1975), superseded by Rules of Trial Procedure 30-31, held in *Murphy* v. *State*, 265 Ind. 116, 119 (1976), to apply to criminal cases through Ind. R. Crim. P. 21 (1973); Iowa R. Crim. P. 12 (1978); Mo. Ann. Stat. § 545.400 (Vernon 1953) and Mo. R. Crim. P. 25.41 (1979); N.H. Rev. Stat. Ann. § 517:13 (1974); Tex. Crim. P. Code Ann. art. 39.02 (Vernon 1966); Vt. R. Crim. P. 15 (1974). See generally W. Hill, Pretrial Discovery of Prosecution Witnesses in State Courts, in 1A Criminal Defense Techniques c. 11 (Bernstein ed. 1977); Zagel & Carr, State Criminal Discovery and the New Illinois Rules, 1971 U. Ill. L.F. 557; Note, Discovery Depositions: A Proposed Right for the Criminal Defendant, 51 S. Cal. L. Rev. 467 (1978); Comment, Depositions as a Means of Criminal Discovery, 7 U.S.F.L. Rev. 245 (1973).

[14] "[1] Whoever, with malicious intent to maim or disfigure, cuts out or maims the tongue, puts out or destroys an eye, cuts or tears off an ear, cuts, slits or mutilates the nose or lip, or cuts off or disables a limb or member, of another person, and whoever is privy to such intent, or is present and aids in the commission of such crime, or [2] whoever, with intent to maim or disfigure, assaults another person with a dangerous weapon, substance or chemical, and by such assault disfigures, cripples or inflicts serious or permanent physical injury upon such person ... shall be punished by imprisonment in the state prison for not more than twenty years or by a fine of not more than [$1,000] and imprisonment in jail for not more than [2½] years."

(We have interpolated numbers to mark off what we call the first and second branches of the statute.)

assault and beat William Reilly." As thus charged, the crimes were distinct in the sense of the "same evidence" conception described and applied in our cases,[15] as there were stated elements of the first offense not part of the second, and elements of the second not appearing in the first. See *Kuklis* v. *Commonwealth*, 361 Mass. 302, 306 (1972); *Morey* v. *Commonwealth*, 108 Mass. 433, 434 (1871). Conceding this fact, the defendants nevertheless argue that the grand jury should have been led to indict, under the second branch of the mayhem statute, for assault with a dangerous weapon with intent to maim or disfigure and by such assault inflicting serious or permanent physical injury upon a person—which crime, the defendants suggest, would "include" assault and battery with a dangerous weapon as a lesser offense (whether or not set out by separate indictment). Not to follow the suggested course, the defendants say, but instead to parse the mayhem statute in such a way as to charge an offense distinct from the assault with a dangerous weapon, exposed them to harassment and to the possibility of accumulative punishments, and so should be held to encompass unconstitutional conduct by the State (they mention due process and equal protection). The defendants tried to put this contention to the judge by their motion and renewed motion somewhat artlessly called motions to compel the Commonwealth to "elect."

This court recognized in *Commonwealth* v. *Gallarelli*, 372 Mass. 573, 578-579 (1977), that the "same evidence" rule could be manipulated by a prosecutor so as to harass and oppress. That was said in the context of successive prosecutions, but there may be an element of harassment in the use of multiple charges in the same prosecution when they open up a prospect of "double" punishment for crimes not duplicative in a technical sense, but so closely

---

[15] For separate views as to a certain phase of the "same evidence" rule, see Kaplan & Liacos, JJ., concurring, in *Commonwealth* v. *Gallarelli*, 372 Mass. 573, 580 (1977).

related in fact as to constitute in substance but a single crime. See Note, Twice in Jeopardy, 75 Yale L.J. 262, 266 n.13, 300-301, 304-305 (1965). Prosecutors not less than courts are to heed the admonition to consider "the realities of the offenses and the circumstances within which they occur." *Costarelli* v. *Commonwealth*, 374 Mass. 677, 684 (1978). In the present case, however, we think the sting of the defendants' argument was sufficiently removed because the judge in fact avoided aggravation of punishments and imposed on each defendant concurrent sentences of the same duration. See *Commonwealth* v. *Tabor*, 376 Mass. 811, 825 (1978); *Commonwealth* v. *Kiley*, 373 Mass. 454, 461-462 (1977); *Commonwealth* v. *Pleas*, 370 Mass. 863 (1976). Cf. *Commonwealth* v. *Cerveny*, 373 Mass. 345, 356 (1977); *Commonwealth* v. *Catania, ante* 186, 191 (1979).

4. *Extrinsic evidence of prior inconsistent statement.* To turn to the assignments on evidential or procedural matters at trial, there is first a complaint about the judge's rejecting evidence on a point of some significance. Reilly, on direct examination by the Commonwealth, said Kines on his first visit "commented on the watch, the scar on my hand"; and on the third, made "references to the watch I was wearing, and also to the scar on my little finger there." On cross-examination, Reilly said Kines expressed interest in both his scar and his watch, but when he put his hand through the grille it was in response to a request about his scar. In his written statement of August 25, 1976, Reilly had represented Kines as asking to see the scar ("my stitches").[16] The defense sought vainly to get Reilly to admit that at the pretrial suppression hearing he had mentioned only the watch (that had in fact been his testimony): Reilly said he "may have mentioned" both the scar and the watch. In order to bring home the supposed contradictions, defense counsel

---

[16] Reilly had had stitches removed from his left hand shortly before his arm was smashed.

next day attempted to call the court stenographer to testify to what Reilly had said at the suppression hearing. The judge declined the proffered testimony, and would not act to provide the defendants, as indigents, with a transcript of Reilly's statements at that hearing. We think those statements (offered through the stenographer) were admissible as proof by extrinsic evidence of prior inconsistent statements by Reilly on a matter relevant to an issue in the cause, how the injury occurred; they were not merely "collateral." See *Commonwealth* v. *Franklin*, 366 Mass. 284, 288 n.3 (1974); *Commonwealth* v. *West*, 312 Mass. 438, 440 (1942); 3A J. Wigmore, Evidence §§ 1020-1021 (Chadbourn rev. 1970). But we think Reilly's shifts and confusion were already apparent and the defendants suffered no damage by the exclusion.

5. *Records of prior convictions.* Reilly, like five of the inmates called as witnesses by the defense, was impeached on cross-examination by his prior convictions, read to the jury from the records in some detail. Reilly admitted his convictions. Certified copies of the records were not put in evidence as to any of the inmates impeached. Three days after Reilly's cross-examination, however, the defense offered such records of Reilly's convictions as exhibits. The judge refused the offer. The impeachment was complete on reading the records and establishing that the witness was the subject of them. See G. L. c. 233, § 21; *Commonwealth* v. *Connolly*, 356 Mass. 617, 627, cert. denied, 400 U.S. 843 (1970). The judge was not obliged to admit the records as exhibits, though he could have chosen to do so. See *Commonwealth* v. *Dean*, 6 Mass. App. Ct. 781, 782-783 (1979). Cf. *Commonwealth* v. *Simpson*, 370 Mass. 119, 123-124 (1976); *Commonwealth* v. *Flynn*, 362 Mass. 455, 468 (1972).

6. *Exclusion of surrebuttal testimony.* The judge declined offers by the defense of additional witnesses who would testify by way of surrebuttal to certain pieces of the Commonwealth's rebuttal evidence. The original defense testimony bore on the propositions that a prison visit for

one of the defense witnesses had occurred at a given date, and that Reilly had asked two inmates to slam the door on his arm (on this point the rebuttal witness was Reilly). The first proposition was relatively trivial. The same cannot be said of the second matter, but a trial judge's exercise of discretion in allowing or refusing surrebutter for purposes of corroboration should be rarely interfered with on appellate review, and will not be in the present case. See *Commonwealth* v. *Blaikie,* 375 Mass. 601, 610-611 (1978); *Commonwealth* v. *Arsenault,* 361 Mass. 287, 299 (1972).

7. *Prosecutor's closing argument.* It is claimed that the prosecutor, commenting in his closing argument to the jury on the Commonwealth's theory about the noise in the corridor, made conclusory statements not warranted by the evidence; and in regard to the defense theory of a self-inflicted wound, went too far in expressing a personal disdainful view. We think the prosecutor remained within the bounds of tolerable inference about the significance of the noise, but should not have edged his own credit into the balance in attacking the defense hypothesis. But appraising the closing speech as a whole, and taking into account the judge's advice to the jury on the distinction between mere argument and evidence, we do not think the jury were misled.

Concluding, we must take the measure of the whole case, for mistakes which singly appear minor or venial may sum up as a serious injustice. We have expressed concern about some parts of the present record, but on full consideration and reflection we believe the verdicts and judgments deserve to stand.

*Judgments affirmed.*