Agnes, Peter W., J.
1. Introduction
This is a most tragic case in which the defendant, Lee Chiero, an individual with a documented history of severe mental health problems, stands indicted for the murder of his own mother who tried to help her son deal with and obtain treatment for his problems. The defendant has filed amotion to dismiss the indictment on two grounds. First, the defendant maintains that the Commonwealth deliberately deceived the grand jury about the defendant’s mental health problems and crossed the line established by Commonwealth v. O’Dell 392 Mass. 445, 446-47 (1984) (“Our affirmance of the dismissal of the indictment results from our conclusion that the integrity of the grand jury proceeding was impaired by an unfair and misleading presentation to the grand jury of a portion of a statement attributed to the defendant without revealing that an exculpatory portion of the purported statement had been excised”). Second, the defendant maintains that the Commonwealth violated an obligation it had to present to the grand jury exculpatory evidence relating to the defendant’s mental health problems. See Commonwealth v. McGahee, 393 Mass. 743, 746 (1985) (“When the prosecutor possesses evidence which would greatly undermine the credibility of evidence likely to affect the grand jury’s decision to indict, the prosecutor must alert the grand jury to the existence of such evidence”).
2. Background
The essential facts are not in dispute.[1] The Grand Jury heard testimony that the victim was killed on January 15, 2007 in her own home. No one was present other than the victim when the police arrived at the scene. The victim’s body was found in the basement. She died as a result of multiple stab wounds of her eyes, brain and face. There were many bloodstained areas observed in the basement, on the stairs leading to the basement and there were bloody footprints in the upstairs area. The police observed a video camera pointed in the direction of the body with a bloody fingerprint on its strap. The victim’s vehicle was missing from the garage.
3.
There is evidence that the defendant contacted his brother-in-law after the homicide by using his mother’s cell phone. The defendant made numerous telephone calls following the homicide to his brother-in-law urging him to enter the mother’s home to find her. The defendant was arrested later the same day at the Newton-Wellesley Hospital where he had gone for treatment for a cut on his hands. Reportedly, the defendant told a nurse that he injured himself during an argument with his mother’s boyfriend. The defendant had a bag in his possession at the time of his arrest at the hospital which contained six videotapes. These items were seized by the police. The defendant had driven his mother’s car to the hospital. Her blood-covered purse was in the trunk. The interior of the car was bloodstained as well.
4.
The grand juiy heard testimony from Detective Boland that he viewed the videotapes including one that had been in the camera found at the crime scene. Detective Boland told the grand jurors[2] that it depicts the defendant and the victim together on the day of her death at approximately 11:30 a.m. The victim has suffered some sort of injury to her face but is alive and speaking to her son. The defendant’s voice is heard and occasionally he walks in front of the camera and is visible. The tapes in question include recordings made on January 5, 8, 9, 13 and 15, 2007. At the conclusion of Detective Boland’s testimony, a grand juror asked whether the tapes included audio as well as video. The Detective answered “yes.” When asked if the information was “helpful as far as to go along with the visual, what may have happened?” The Detective answered “yes.” The Detective also was asked whether the recordings made on other dates had anything to do with the crime on the 15th. He answered “no,” then explained it includes over two hours of taping and “I don’t know if I would be able to give that an easy answer.” Finally, a grand juror asked if the tapes found on the defendant’s person at the time of his arrest were helpful to the investigation? The Detective answered “yes,” and explained that the police had recovered 28 tapes in total “and I feel that they all play a part in understanding the crime. However, they may not directly be involved in the crime.”
*377 5.
There is evidence that, the defendant moved back into the victim’s home several days before the homicide. The previous month, the victim made an effort to have the defendant involuntarily committed. She had done so in the past. The defendant’s primary care doctor approved an emergency commitment under G.L.c. 123, §12(a) because he believed the defendant was “paranoid” and may be a risk to his mother among others. The defendant was hospitalized but released on or about December 22nd, about three weeks before the homicide. During the investigation, the police discovered and secured a number of video tapes made by the defendant. In one tape that appears to have been made shortly before the homicide, the defendant is conversing with the victim in a manner that suggests, as his attorney maintains, see Defendant’s Memorandum at 5, he (the defendant) believes his mother, the victim, is involved with her friends in a conspiracy to do harm to him and that at least raises a live issue as to whether he was criminally responsible for the acts he committed shortly thereafter. Several months after the homicide, Dr. Karin Towers, a licensed forensic psychologist of Forensic Mental Health Services at the Bridgewater State Hospital, filed a report after conducting an examination of the defendant under G.L.c. 123, §15(b). Her report is part of the record that is before me. After reviewing the defendant’s mental health histoiy, investigatory materials relating to the homicide, and conducting an interview with the defendant, she explains that the defendant’s mental health appears to have declined significantly after a 1999 hospitalization following a Halloween night encounter with a male who tried to engage in sexual relations with him. She opined that he (the defendant) manifested symptoms of paranoia thereafter which grew more intense in the months leading up to the homicide. Dr. Towers concluded that the defendant was not criminally responsible at the time of the homicide. See Defendant’s Memorandum, Attachment B. As for the alleged crime itself, the defendant’s account was that he wanted his mother to tell him who else was involved in the conspiracy, and that as they were discussing it, the two of them tumbled down the cellar stairs. He maintains that he next remembers stabbing her and realizing that he was mistaken about her because she wasn’t telling him anything about the .conspiracy. As Dr. Towers reported it, “Mr. Chiero said he knew as he started attacking his mother that he was going to be arrested and spend the rest of his life in jail.” Defendant’s Memorandum, Attachment B, Towers Report at 20.
6.
The defendant’s case was presented to the Grand Juiy on May 14, 2007. By that date, the Commonwealth had considerable information in the form of medical reports and information from family members and prior criminal episodes that the defendant was likely suffering from a longstanding mental illness at the time of the homicide, and that the defendant was exhibiting the signs of mental illness around the time of the homicide.
7. Discussion
It is a rule of long standing in this Commonwealth that courts will not review the sufficiency or the competency of the evidence presented to the grand juiy. Commonwealth v. O’Dell, 392 Mass. 445, 450 (1984). There are two principal exceptions to this rule. In Commonwealth v. McCarthy, 385 Mass. 160, 163 (1982), the court held that an indictment obtained on the basis of evidence which does not establish probable cause to believe a crime occurred and the defendant is the perpetrator must be dismissed. In Commonwealth v. O’Dell supra, the Court held that when the integrity of the grand juiy’s function is impaired by a distorted, incomplete or inaccurate presentation of evidence any resulting indictment must be dismissed. Commonwealth v. Salman, 387 Mass. 160, 166 (1982) (grand juiy integrity may be impaired by use of “knowingly false testimony”); Commonwealth v. St Pierre, 377 Mass. 650, 656 (1979) (grand juiy integrity may be impaired by excessive reliance on hearsay).
8. Sufficiency of the evidence presented to the Grand Juiy
The grand juiy must hear evidence that there is probable cause to believe a crime occurred and that the defendant was the perpetrator or a joint venturer. Probable cause is established when there is “reasonably trustworthy information .. . sufficient to warrant a prudent man in believing that the defendant had committed ... an offense.” Commonwealth v. O’Dell 392 Mass. 445, 450 (1984), quoting Commonwealth v. Stevens, 362 Mass. 24, 26 (1972). In this case, the Commonwealth presented evidence to the grand juiy amounting to ample probable cause that the defendant intentionally killed his mother on January 15, 2007 without justification or excuse. It is true, that the Commonwealth was aware of and in possession of information, such as the report by Dr. Towers, that would make the issue of criminal responsibility a live issue at trial, if not create a reasonable doubt about the defendant’s guilt at trial. The state of the law in this Commonwealth today, however, is that the presumption of sanity has evidentiary value even when there is a unanimity of opinion by expert witnesses that a person was not criminally responsible. See Commonwealth v. McLaughlin, 431 Mass. 506, 509 (2000). See also id. at 520-34 (Spina, J., concurring) (Justice Spina provides a comprehensive assessment of Massachusetts law regarding the presumption of sanity and makes the suggestion that our common law should be changed to make insanity an affirmative defense as to which the defendant would have the burden of proof by a preponderance of the evidence). See also Commonwealth v. Kostka, 370 Mass. 516, *378 528-29 (1976) (Under Massachusetts law, the “presumption of sanity” does not disappear from case after evidence of insanity has been introduced and may be given evidentiary value by the juiy).[3]
9.
When we consider the peculiar nature of the “presumption of sanity” in Massachusetts, it becomes clear that, at the grand jury stage, evidence of criminal responsibility is not part of the Commonwealth’s case-in-chief, and thus the Commonwealth is not required to present any evidence that the defendant was sane or criminally responsible at the time he committed the acts in question to establish probable cause for the return of an indictment. The Supreme Judicial Court has observed that “(p)rosecutors are not required in eveiy instance to reveal all exculpatory evidence to a grand juiy, but they must disclose evidence that would greatly undermine the credibility of evidence likely to affect the grand juiy’s decision to indict.” Commonwealth v. LaVelle, 414 Mass. 146, 150 (1993) (quotations and citations omitted). Evidence that the defendant was insane or lacked criminal responsibility relates to a defense under Massachusetts law, and in its absence the grand juiy is not impaired in carrying out its function to assess whether there is probable cause for the return of an indictment against the defendant. See Commonwealth v. Connor, 392 Mass. 838, 854 (1984) (“a prosecutor cannot be permitted to subvert the integrity of grand juiy proceedings by ‘selling’ the grand jury ‘shoddy merchandise’ without appropriate disclaimers”). See also State v. Hogan, 144 N.J. 216, 236 (1996) (“In order to perform that vital protective function, the grand juiy cannot be denied access to evidence that is credible, material, and so clearly exculpatory as to induce a rational grand juror to conclude that the State has not made out a prima facie case against the accused”). Cf. United States v. Williams, 504 U.S. 36, 51 (1992) (Supreme Court examined the histoiy of the grand juiy system and stated that “requiring the prosecutor to present exculpatoiy as well as inculpatoiy evidence would alter the grand juiy’s historical role, transforming it from an accusatory to an adjudicatoiy body”); id. at 69-70 (Stevens, J. dissenting) (even the four dissenters would limit the duty of the prosecutor to the presentation of exculpatoiy evidence which “directly negates the guilt of the accused”). In short, because it is emphatically not the function of the grand juiy to determine guilt or innocence, see Commonwealth v. Geagan, 339 Mass. 487, 497 (1959), the Commonwealth’s case established probable cause and satisfied the requirements of Article 12 of the Declaration of Rights, even though it omitted considerable evidence that the defendant may have lacked criminal responsibility at the time he committed the homicide.[4]
10. Impairment of the integrity of the grand juiy process
The defendant maintains in the alternative that one of the witnesses who testified before the grand juiy, state police trooper Boland, misled the grand jurors. “For Trooper Boland to testify that the tapes ‘all play a part in understanding the crime,’ without adding that the reason the tapes play such a role is that they evidence Mr. Chiero’s insanity, delusions and paranoia, was grossly deceptive.” Defendant’s Memorandum of Law at 11. Based on the evidence before me, the Trooper’s testimony was an accurate statement. The witness did not paint a distorted or misleading picture of the evidence. The tape recordings, particularly those close in time to the homicide, are indicative of a motive. The defendant may have believed that his mother was involved in some sort of conspiracy to deceive or harm him as a result of a delusion brought on by a mental illness, and, nonetheless, be guilty of murder. Although the tapes may also have permitted the grand juiy to draw other inferences about the defendant’s state of mind or lack of criminal responsibility does not alter the fact that they do supply evidence of a motive. It is not the responsibility of a witness to assess and opine on the legal significance of the evidence, but rather to testify truthfully about what he knows. Moreover, the evidence put before this court by the defendant can be interpreted to indicate that the defendant was aware that he was committing a crime. As Dr. Towers reported it, “Mr. Chiero said he knew as he started attacking his mother that he was going to be arrested and spend the rest of his life in jail.” Defendant’s Memorandum, Attachment B, Towers Report at 20.
11.
The defendant also maintains that the prosecutor who presented the case is responsible for misleading the grand juiy by presenting evidence about the tapes without playing the audio portion for the juiy. The detective told the grand jury that there was audio as well as video on the tapes and that it was helpful to understand the crime. The Commonwealth is not required to present all the evidence in its possession that may have a bearing on the case. There is no evidence in the record before me that the Commonwealth presented the grand juiy with an incomplete, inaccurate or distorted account of its case-in-chief. The defendant’s reliance on Commonwealth v. Mayfield, 398 Mass. 615 (1986), is misplaced. There, the Court observed that “if the Commonwealth or one of its agents knowingly uses false testimony to procure an indictment, the indictment should be dismissed, and a prosecutor who learns of the use of the knowingly false, material evidence has a duty to come forward.” Id. at 620. In order for the defendant to qualify for relief under this standard, the Commonwealth must knowingly present false or deceptive testimony, and it must be significant. Because evidence of the defendant’s criminal responsibility at the time of the crime is not an element of the Commonwealth’s burden of proof in Massachusetts, the Commonwealth is under no obligation to present such evidence before the grand juiy.
*379 12.
There is an additional- reason why the Commonwealth should not be required to present evidence that the defendant may have lacked criminal responsibility to the grand juiy. It is the public policy of the Commonwealth that in the case of a person found not guilty by reason of insanity, the court should exercise its discretion and decide whether the defendant should be hospitalized at a facility operated by the Department of Mental Health for a period of forty days for “observation and examination.” G.L.c. 123, §16(a). In cases involving charges of homicide in which the defendant is found not guilty by reason of insanity, this court takes judicial notice of the fact that the practice of the Superior Court is to order a commitment of the defendant for observation. It makes no sense to say that the determination of whether the defendant was or was not criminally responsible for his conduct should be left up to the grand juiy because they are not authorized to make any decision other than “true bill” or “no bill,” and thus they are not authorized nor are they equipped to make a judgment about whether someone should be deemed not guilty by reason of insanity. Our courts have “never taken away from a trier of fact the determination whether a defendant was criminally responsible when the evidence raised the issue.” Commonwealth v. Keita, 429 Mass. 843, 845 (1999). The end result of a grand juiy voting a “no bill” in a case such as this would be to frustrate the public policy of the Commonwealth embodied in G.L.c. 123, §16. Cf. People v. Lancaster, 69 N.Y.2d 20, 29 (1986).
ORDER
From all accounts, the defendant is represented by competent counsel who has conducted a comprehensive investigation of the facts and circumstances surrounding the alleged crime, and the mental health of his client. The defendant has announced that he intends to present a defense at trial that he lacked criminal responsibility and should be found not guilty by reason of insanity. There is evidence in the record which, if believed by the finder of fact at a trial, would warrant a finding that the defendant is not guilty by reason of insanity. However, there is also other evidence which if believed by the finder of fact at trial would warrant a finding that the defendant is guilty of murder. The defendant’s motion to dismiss asks this court, in effect, to usurp the authority of the trial juiy and order that this decision be made by a grand juiy. See Commonwealth v. Mutina, 366 Mass. 810, 824 (1975) (Quirico, J., dissenting), discussing Commonwealth v. Anthes, 5 Gray 185, 193-94 (1855). Here, the grand juiy heard sufficient evidence to establish probable cause to believe that the defendant was guilty of murder. The Commonwealth’s presentation of the case did not impair the integrity of the grand jury process. Accordingly, the defendant’s motion to dismiss is DENIED.

It should be noted that details of the defendant’s mental health histoiy, including evaluations of the defendant’s criminal responsibility, have been placed in the public record by his counsel in support of this motion. The Commonwealth did not seek a protective order or raise an objection. The Court also received and has relied upon the grand jury minutes of May 14, 2007 (testimony of State Police Detective Boland).

The videotapes were not played for the grand juiy nor introduced as exhibits before the grand jury. There is no evidence that the grand jury asked for this evidence.

In fact, the Supreme Judicial Court has noted time and again that the Commonwealth may meet its burden at trial to prove the defendant’s sanity without calling an expert, even though the unanimous opinion of the experts who testify is that he lacked criminal responsibility. See, e.g., Commonwealth v. Shelley, 381 Mass. 340, 347 (1980) (“The jury need not accept uhcontradicted expert testimony that the defendant was insane at the time of the murder”). See also Commonwealth v. Kappler, 416 Mass. 574, 579 (1993), quoting Commonwealth v. Cullen, 395 Mass. 225, 229 (1985) (Thejury may “infer sanity from the ‘facts underlying the crime and evidence of [the defendant’s] actions before and after the crime’ ”).

If the prosecutor was required to present evidence to the grand jury that the defendant may have lacked criminal responsibility, it may also have to present expert witnesses to explain the evidence and give the jury appropriate instructions about how to assess the evidence. Such additional burdens would take us well on the way to converting the grand jury into an adjudicatory body.