COMMONWEALTH
vs.
Harry N. SHUMAN

No. 80-403

Superior Court
Commonwealth of Massachusetts

August, 1981

**Richard Brody, ADA,** counsel for plaintiff
**Willie Davis,** counsel for defendant

## MEMORANDUM OF DECISION

Prior to his trial, both this defendant (Shuman) and a co-defendant (Dr. Shwartz) moved for appropriate relief upon the ground that they had been entrapped by public officials. After hearing, this Court denied the motion and the matters went to trial, both defendants being convicted. Dr. Shwartz has not appealed but Shuman has and this matter is thus ripe for the entry of a Memorandum of Decision setting forth the facts found during the pre-trial hearing and the legal analysis upon which this Court has relied. **Commonwealth v. Cook,** 351 Mass. 231, 234 (1966) (Kirk, J.).[1]

[1] This Court is not unmindful of the fact that in **Commonwealth v. Collins,** 1981 Mass. App. Ct. Adv. Sh. 29, 33, "the (trial) judge reserved the right to make specific findings 'if necessary or appropriate' at a later time" and the Appeals

During the summer of 1978, information concerning a possible insurance fraud came to the attention of the Major Crimes Unit of the Massachusetts State Police. Proceeding under orders of Captain Robert Enos, State Police troopers obtained two motor vehicles and without the knowledge of the insurance companies involved, insured them under false names. They then staged an accident and another state trooper, privy to the undercover operation but not directly involved in it, filed a false report of accident which stated, "no visible sign of injury but claim of injury by an individual involved." He issued a false citation and a fine was paid pursuant thereto. False accident reports were then filed with the insurance companies by the undercover troopers claiming to have been involved in the accident. The State Police reasonably believe that all this was necessary to lay a credible groundwork to uncover the suspected scheme of insurance fraud.

The undercover troopers went first to Dr. Shwartz. Various inculpatory statements were made by Dr. Shwartz in their presence but they need not be recounted here as this Court does not rely upon them in determining the motion with respect to Shuman.[2]

Following a visit to Dr. Shwartz, the undercover troopers made an appointment with Shuman, an attorney. When they kept the appointment, Shuman introduced himself, took them into a conference room, and asked, "What are the extent of your injuries?" The troopers simply laughed jovially and Shuman joined in the laughter.

One of the undercover troopers said, "Ask Shwartz." Shuman responded, "I'll call him." Shuman proceeded to tell the troopers that it would look better if they did not return to work and, when they agreed to stay at home, he said, "Good. We can add this to the claim."

Shuman then said, "You have to get your medical bills up over $500 to collect"

and recommended that the undercover troopers see certain specialists to which he would refer them. Further inquiry as to the injuries of one trooper went like this:

Shuman: "You must have hit your head, right?"

Undercover trooper: "No."

Shuman: "You must have hit your head on the windshield and have terrible headaches."

Undercover trooper: "Oh yes, I remember. If (the specialist to whom you

Court observed "that he should have done so at the time of the **voir dire** or before the end of the trial." While this passage may be read as disapproving the practice followed here, I do not believe it was intended to be construed so broadly. As support for its observation, the Appeals Court relied on **Commonwealth v. Garcia,** 1980 Mass. Adv. Sh. 21, 26, which does not hold that findings and rulings must be made during the course of the trial but simply expresses the need for such documentation prior to the hearing of the appeal. The matter is, however, specifically addressed by Mr. Justice Kirk in **Commonwealth v. Cook, supra,** where the Supreme Judicial Court holds that "to require ... that the judge file his specific findings simultaneously with his ruling on admissibility, would result in delay in the progress of the trial and the imposition of a needless burden on the trial judge. If a defendant is found not guilty, or, if found guilty, does not appeal, the delay in the trial and the effort of the judge might serve no purpose." It would appear that the Supreme Judicial Court continues to adhere to these views, see, **Bruno v. Bruno,** 1981 Mass. Adv. Sh. 1572, 1577 ("(F)indings were made from the bench at the close of the case. Certain matters which might have been dealt with were not mentioned. Although expeditious disposition of contested matters is desirable, there are often situations in which reflection, aided by written requests for findings of fact, is the better course"), and, indeed, the wisdom of the present practice is illustrated by the fact that Dr. Schwartz did not appeal and findings with respect to him would be of no consequence.

[2] It may well be that the statements of Dr. Shwartz are, in fact, the statements of a co-conspirator made during the course of and in furtherance of a conspiracy, which statements are thus admissions upon the part of both co-conspirators. **Commonwealth v. White,** 370 Mass. 703, 708-709 (1976) (Kaplan, J.). This Court need not decide the point as part of a ruling upon a pre-trial motion, however, since the ruling as respects Shuman will stand upon a consideration of his own admissions taken separately.

are sending us) is an expert, won't he know?''

Shuman: ''He knows how to play the game. You see, hypothetically you're going to see (the specialist) fifteen to twenty times but actually you won't have to go see him.''

One month later, in a telephone conversation between one of the undercover troopers and Shuman, Shuman said, ''(The other undercover trooper) has gone to the specialist but complained of no injury. He must be straight as an arrow. I'll have to send him to another specialist.''

Further, the Court finds that each time the undercover troopers were queried by Shuman about their injuries, they laughed in a manner which denoted the absence of any such injuries. The Court infers that Shuman, after these conversations, conferred with Dr. Shwartz and took further steps to make claim against the insurance companies for injuries he knew to be nonexistent.

> Entrapment is a defense which may be asserted when a defendant is intentionally induced by the government or its agents into committing all the elements of a criminal offense. **United States v. Russell**, 411 U.S. 423, 435 (1973). The defense arises only if the criminal conduct was the product of the ''creative activity'' of law enforcement officers or agents, **Sorrells v. United States**, 287 U.S. 435, 451 (1932) ... (but) no ''entrapment exists 'if the accused is ready and willing to commit the crime whenever the opportunity might be afforded,' '' **Commonwealth v. Miller**, 361 Mass. 644, 651 (1972), quoting from **United States v. Groessel**, 440 F. 2d 602, 605 (5th Cir.), **cert. denied**, 403 U.S. 933 (1971) (.)

**Commonwealth v. Thompson**, 1981 Mass. Adv. Sh. 209, 213-214.

The key to the entrapment defense is

thus government inducement, more specifically, the employment of persuasion or inducement to create a substantial risk that the offense will be committed by a person other than one who is ready to commit it. Model Penal Code Sec. 2.13(1). Gilbert, **Criminal Law**, Sec. 223 (1976). Compare, **State v. Boccelli**, 105 Ariz. 495 for the minority view that ''reprehensible police conduct'' will support an entrapment defense on the theory that the primary purpose of this defense is to control police conduct and the accused's predisposition to commit the crime is therefore immaterial. Here, no such government inducement or persuasion is present. Here there is no evidence of persuasion, importuning, a play on sympathy or other emotion, or any other factor beyond the simple opportunity for criminal gain afforded by the circumstances created by the undercover troopers. Compare:

> **Sherman v. United States**, 356 U.S. 369, 371 (1958) (defendant only agreed to sell narcotics illegally ''after a number of repetitions of the request, predicated on (the informant's) presumed suffering''). **Sorrells v. United States**, 287 U.S. 435 (1932) (defendant sold whiskey to agent only after repeated requests and pleas based on common loyalty to a military unit). **United States v. Borum**, 584 F. 2d 424 (D.C. Cir. 1978) (inducement found where undercover agents solicited guns from defendant twenty times).

**Commonwealth v. Thompson, supra** at 215. Upon these facts, therefore, Massachusetts law will not support the entrapment defense.

Despite the traditional analysis, the defendant here argues strenuously, that, as an attorney, it is especially reprehensible to ''set him up'' and then use against him the statements he made in discharge of his duty to zealously advance

the cause of those he reasonably took to be his clients. It's difficult to understand just what legal significance the defendant attaches to this plaint. I take it that he is urging that the statements he made to the undercover troopers be suppressed upon the theory that, in context, it is wrong to "sting" a lawyer and thereby chill the profession's willingness to zealously advocate the client's cause.

While original, this argument is hardly frivolous. Our adversary system is one which sometimes encourages, and at least tolerates, the use of subterfuges to get at the truth. Keeton, **Trial Tactics and Methods,** 326-327 (2d ed. 1973). Indeed, nowhere are an attorney's obligations to the truth and his obligations to his clients so sorely tested as in the area of information gathering from clients and witnesses and preparation of their testimony. There is general agreement that "witness preparation for trial purposes is not discovery. This is not the time to learn 'what the case is all about' or to obtain interesting information. Witnesses favorable to your side must be prepared for testifying in court to those facts which will support your theory of the case." Mauet, **Fundamentals of Trial Techniques,** 11 (1980). A learned and skillful trial lawyer speaks of the need to "horseshed the witness and ... brush him up before he testifies. ... Do not hesitate to suggest ... more effective answers. You and the witness are going over his testimony to develop that kind of answer. If you shy away from making suggestions, you are not doing your job. ... Press the witness if need be. In extreme cases, put the situation to the witness bluntly." Vetter, **Successful Civil Litigation,** 280, 284-285 (1978). Others frankly recognize that an attorney has "the opportunity to shape the witness' testimony, often to the point of recreating it in an image closer to that which the lawyer desires than to that which the truth requires ... (P)reparation of one's own witness for trial is hardly,

under our adversary system, a public ceremony." Levin & Cramer, **Trial Advocacy,** 30 (1968). Judges and lawyers alike must admit that the line between "facilitating" communication on the one hand and fabricating evidence or suborning perjury on the other is not well marked.[3] Perhaps the most careful analyst of this area is Monroe Freedman in **Lawyers' Ethics in An Adversary System,** 67-69, 71, 74-75 (1975) ("There is no conceivable ethical requirement that the lawyer trap the client into a hasty and ill-considered answer before telling him the significance of the question"). See, Bellow & Moulton, **The Lawyering Process,** 247-272 (1978).

Yet even the most expansive and indulgent acquiescence in the norms essential to an adversary system cannot justify Shuman's conduct here. While he may not be faulted for informing his clients of the legal requirements necessary to support their claim, he cannot be excused for expressly suggesting to them the fabrication of medical visits and treatments that were never intended to take place. Any legal system which condoned such conduct by the officers of its courts would not be worthy of the name. Thus, recognizing that the line between propriety and impropriety in attorney - client relationships is difficult and not always clear, Shuman has nevertheless transgressed far beyond the conduct expected of the most zealous but honest advocate.

Accordingly, Shuman's motion was denied.

**William G. Young**
**Justice of the Superior Court**

---

[3] Indeed, our present rule governing the conduct of an attorney in a criminal case who learns that his client intends to testify falsely, DF 13(b) of Supreme Judicial Court Rule 3:08 (formerly Rule 3:22A), is a candid compromise between the extremes on either side ... (of a) controversy (which) is not one capable of solution by any formula which will be satisfactory to all disputants." Statement of Quirico, J. concerning SJC Rule 3:22A published with the Rule, pp. 5-6 (February 14, 1979).