COMMONWEALTH
vs.
Stephen C. DELANEY, Jr.

Nos. 75910-914

Superior Court/Plymouth County
Commonwealth of Massachusetts

April 22, 1982

**Joseph Gaghan,** counsel for plaintiff.
**Kenneth Fishman,** counsel for defendant.

## MEMORANDUM AND ORDER ON MOTIONS

On August 25, 1981, Stephen C. Delaney ("defendant") was charged with various criminal offenses in five separate indictments. Indictment nos. 75910 and 75911 charged the defendant with assault and battery by means of a dangerous weapon on George Donovan and Arlene Massey ("the victim"). Indictment no. 75912 charges him with wanton, willful, and malicious destruction of personal property. Indictment no. 75913 charges the defendant with assault and battery on the victim and indictment no. 75914 charges him with assault with intent to commit rape upon the victim. Prior to trial, the defendant moved to dismiss indictment nos. 75910-75912 upon the ground that there was insufficient evidence presented to the grand jury upon which those three indictments could be based. In the event that the motions to dismiss were to be denied, the defendant moved for relief from prejudicial joinder pursuant to Mass. R. Crim. P. 9(d)(1). The defendant also moved to suppress a certain pre-trial identification of him made by the victim. All three motions were denied by this court and, the defendant having been convicted at a jury trial, and having appealed, the matter is now ripe for the entry of findings and rulings on the three pre-trial motions. **Commonwealth v. Cook,** 351 Mass. 231, 234 (1966) (Kirk, J.). **Commonwealth v. Shuman,** 2 Mass. Supp. 647 n.1 (Superior Ct. 1981). **Commonwealth v. Breese,** 1 Mass. Supp. 343, 344 (Superior Ct. 1980) **affd.,** Mass. App. Ct. Adv. Sh. (1981). The court addresses first the motion to suppress since the factual findings required for a resolution of that motion set the stage for a consideration of the other two motions.

On May 25, 1981, the victim, a 17-year-old woman, left her home in Weymouth and rode her bicycle to a rocky outcropping above the beach in Hull. She arrived between 8 and 8:30 P.M. as the sun was setting. Parking her bicycle, she sat down on the rocks to watch the sunset. This area is commonly known as "The Ledges" and a bar bearing that name is nearby, situated at a lower elevation nearer the beach.

Shortly after she had seated herself on the rocks, a young man approached from the area of the bar, climbing up from her left and seating himself beside her. Although the victim preferred to be alone to watch the sunset, the man struck up a conversation with her during which he revealed that his name was "Steve", that he used to live in Hull but now lived in

Quincy, and that he owned a "'79 black Yamaha [motorcycle]." During the course of this one-sided conversation, which the victim estimated lasted 15 minutes but which the court finds lasted for a somewhat lesser time, the victim observed that the man had light-colored hair, a mustache, and that he had with him a cream-colored sweatshirt with a blue yoke and red stripe. As he was seated next to her, the victim estimated that he was a small individual, little more than 5'6" in height.

The desultory conversation concluded with the man stating, "I used to drink at the Ledges. Animals hang out there. When I was a kid and we saw a girl up on the rocks, we -". At this point the victim interrupted him to state, "I can take care of myself."

In response, the man said, "What would you do - ?" and then grabbed her shoulders and wrestled her to the ground.

The victim managed to get up and get her bicycle but, at this point, the man straddled the bicycle's rear wheel, locked his arm around her neck and dragged her down over the rocks about four or five feet to the shelter of the next ledge. At this point, he pushed her to the ground, straddling her with his knees on each side of her hips. In this position, with the victim pinned to the ground and the man above her, there ensued a conversation from which one could reasonably infer that the man intended to carry out a forceable rape while the victim played for time, trying to talk him out of his expressed intent. The court finds that, at this time, the man's face was not far from that of the victim and was lit by the twilight of the sun, which had just set. The man interspersed his conversation with threats of physical harm and, at least once, tried to kiss or nip the victim's neck. Finally, however, he unbuckled his pants as he said, "Yeah, we will talk."

At this point, the victim screamed loudly and curled onto her left side, the assailant striking her twice in the stomach and then fleeing.

The court infers that the termination of the assault was occasioned by the fortuitous arrival of a couple jogging on the beach. The victim stumbled down over the rocks to this couple and they assisted her in finding a Metropolitian District Commission policeman.

The victim was crying when she gave an identification of her assailant to this police officer. She told him that the man who had assaulted her had light colored hair, a mustache, called himself "Steve" and was of medium build wearing street clothes, which she described as dungarees or corduroys. The police officer returned with her to the place where her bicycle had been left and then went about his business.

The victim cycled down toward Route 228 and stopped of Rockland Street to comb her hair. By now darkness had descended. Hearing a motorcycle approaching from behind her along the road, she remembered that her assailant had said that he owned a black Yamaha and, as the motorcycle passed, she recognized the man who had assaulted her by the sweatshirt he was wearing. At this point the victim was "mad and scared."

At once, she attempted to flag down passing cars, calling on them to stop and help her. Alone and frightened, with woods to her left and a marsh to her right, the victim was determined to get help.

Finally, a red Corvette occuped by two young men stopped to help her. After some conversation, she got in the vehicle with the driver, George Donovan, and the other occupant got out to ride her bicycle home. A short distance up the road, a figure came out of the woods which bordered the roadway.

The victim has never made any positive identification of this individual. The most she is able to say is that "she assumed" that the individual emerging from the woods was the same one who had earlier assaulted her and later passed her on his motorcycle going the same direction.

Mr. Donovan and the victim proceeded along the road, stopping at a traffic light in Hingham. While they were stop-

ped at the light, a motorcycle approached from rear and, as it passed, its driver threw a rock through the rear window of the Corvette and then sped away. .

Donovan and the victim proceeded to find a Hingham police officer and next went to the Hingham police station. At the police station, the victim was taken upstairs and interrogated by a policewoman. At this time, the victim was visibly upset and the policewoman, after obtaining the victim's complaint, kept the conversation light.

In the meantime, the Hingham police, acting with commendable alacrity, picked up the defendant and brought him to the police station. The defendant owns a 1979 black Yamaha. On the day in question he was wearing dungarees, a black T-shirt and a beige sweatshirt with red and blue trim. At the hearing, his wife admitted he had been to the Ledges bar three times, including a visit on the day in question. At the police station, the defendant was taken into a holding area and sat in a chair, his left profile being presented to the outer hallway.

Once the defendant had arrived at the police station, the policewoman upstairs with the victim invited her to "Come downstairs to identify someone. Look over your shoulder." This statement triggered in the victim the thought that the police had caught the man who had assaulted her. The victim proceeded downstairs, looking to her left, and walked past the holding room in which the defendant was seated. The defendant was not restrained in any way at this time and no police officer was so situated with respect to the defendant as to indicate that he was in custody or was anything other than a visitor to the police station. Upon perceiving the defendant, the victim immediately said, "That's him. That's the man."

The defendant seeks to suppress this out-of-court identification. There is little doubt that this is an example of a disfavored one-on-one confrontation, in the sense that it was "a calculated move by the police to bring about pre-trial observations of a suspect by an eyewitness." **Commonwealth v. Walker,** 370 Mass. 548, 565 (1976). However, "one-on-one confrontations, whether photographic or in person, while often disfavored, are not subject to a rule of per se exclusion. **Commonwealth v. Venios,** 378 Mass. 24, 29 (1979). **Commonwealth v. Jackson,** 377 Mass. 319, 332 (1979). **Commonwealth v. Nolin,** 373 Mass. 45, 51 (1977). **Nassar v. Vinzant,** 519 F.2nd 798, 801 (1st Cir. 1975). **State v. Middleton,** 170 Conn. 601, 606 (1976)....Rather, the test to be applied in measuring the constitutional sufficiency of single-person confrontations under the due process clause is simply whether the confrontation is unnecessarily suggestive of the defendant. **Commonwealth v. Venios, supra** at 26 - 27. **Commonwealth v. Dugan,** 377 Mass. 303, 315-316 (1979). **Commonwealth v. Marini,** 375 Mass. 510, 519 (1978). **Commonwealth v. Botelho,** 369 Mass. 860, 867 (1976). See, **Moore v. Illinois,** 434 U.S. 220, 227, (1977); **Simmons v. United States,** 390 U.S. 377, 384 (1968); **Stovall v. Denno,** 388 U.S. 293, 301-302 (1967)." **Commonwealth v. Storey,** 378 Mass. 312, 317 (1979). In the totality of the circumstances, the confrontation which occurred in the instant case was not unduly suggestive of Delaney.

What occured here is, in fact, less suggestive than the confrontations upheld against due process challenges in **Commonwealth v. Bowden,** Mass. Adv. Sh. (1980) 75, 81 ("The police told Mr. Soares [an eyewitness] to look through the window of the detention cell in which the defendant was sitting alone to see if he could identify the defendant") and **Commonwealth v. Coy,** Mass. App. Ct. Adv. Sh. (1980) 1539, where the Appeals Court reversed the ruling of a justice of the Superior Court that a confrontation between an untreated mugging victim in her hospital bed and "the defendant and his companion...[who] were stood at the foot of the bed by the police officers" was unduly suggestive. Clearly it has none of the additional suggestive elements, such as requiring the defendant to repeat statements allegedly made by the

'assailant, which were called improper in **Commonwealth v. Powell,** Mass. Adv. Sh. (1980) 1149, 1151. Here there is no special element of fairness. **Cf. Commonwealth v. Moon,** Mass. Adv. Sh. (1980) 1337, 1344.

The propriety of show-ups which are not unduly suggestive has been frequently confirmed.

"[T]he police procedure of arranging...show-ups is recognized as usual and natural and justified by the need for efficient investigation in the immediate aftermath of crime." **Commonwealth v. Barnett,** 371 Mass. 87, 92. Exigent or special circumstances are not a prerequisite. **Id.** See also **United States v. Hines,** 455 F.2d 1317, 1327 (D.C. Cir. 1971), cert. denied, 406 U.S. 975 (1972). Such confrontations permit witnesses to view the suspect while recollection is fresh and before other images crowd in to distort the original picture, and provide the witness with a good opportunity for an accurate identification. "A further consideration is that prompt confrontation yielding negative result, besides freeing the innocent, informs the police that a possible predisposition on their part is or may be in error and releases them quickly to follow another track." **Commonwealth v. Barnett, supra** at 92. See also Am. Law Inst. Model Code of Pre-Arraignment Procedures 160.2(1)(a) and commentary at 436-438 (proposed official draft 1975). Such meetings are particularly valuable and permitted where the police are working from a description of the criminal provided by the victim immediately after the crime. **Commonwealth v. Bumpus,** 354 Mass. 494, 501. **Commonwealth v. Dickerson,** 372 Mass. 783, 790 (1970)...[Accordingly,] the un-

questioned authority in this Commonwealth holds that show-ups arranged by the police between victim and suspect promptly after a crime are constitutionally permissible. **Commonwealth v. Bumpus,** 354 Mass. 494, 501 (1968). **Commonwealth v. Connolly,** 356 Mass. 617, 624 (1970). **Commonwealth v. Benoit,** 362 Mass. 564, 566 (1972), **Commonwealth v. Barnett,** 371 Mass. 87, 92 (1976). **Commonwealth v. Dickerson,** 372 Mass. 783, 789-791 (1977). **Commonwealth v. Coy,** Mass. App. Ct. Adv. Sh. (1980) 1539, 1543, 1544.

Even were this show-up to be found to be unduly suggestive, this Court rules that it is nevertheless reliable and ought, therefore, be admitted. **Manson v. Brathwaite,** 432 U.S. 98 114 (1977). **Commonwealth v. Gordon,** 6 Mass. App. Ct. 230 (1978). **Commonwealth v. Sampson,** 7 Mass. App. Ct. 514, 519 (1979).

This Court bases its finding of reliability upon the following five factors, all of which are outlined in **Mason v. Brathwaite, supra** at 114. First, the victim had ample opportunity to view the criminal at the time of the crime. Prior to the assault he had been seated next to her on the rocks engaging in conversation and the nature of the assault itself caused him to face her through most of it. Moreover, the lighting was good, the assault taking place in the very early evening just after sunset on the high and exposed rocky area overlooking a broad expanse of water.[1] Second, while the

---

1. It is true, of course, that, since the criminal sat initially to the victim's left, was then behind her at the bicycle, and was later astride her, she may well never have seen the left profile of his face which was presented to the hallway at the time of the identification in the police station. While there is some language in **Commonwealth v. Blaney,** Mass. App. Ct. Adv. Sh. (1981), 1995 1998, **further review granted,** 385 Mass. 1101 ("the defendant had no right to withstand his profile - pose photograph from the jury where, as here, the victim observed his

witness may not have been paying close attention to the criminal at the time he initially struck-up an unwanted conversation with her, once the assault began, her entire attention was focused upon her attacker and she had the presence of mind to act rationally throughout and attempt to talk him out of his intention and, when that failed, to scream for help. Indeed, her later conduct reveals the victim to be a lady of spirit and determination and this Court can readily infer that she was paying close attention to her attacker at all material times. Third, her description of her attacker is remarkably accurate in every detail save one. In fact, Mr. Delaney is considerably taller than the man she initially described to the Metropolitan District Commission Policeman. This Court finds this discrepancy immaterial on the ground that the victim's most vivid memories of her attacker are derived from the period while he was seated next to her and later as he was kneeling astride her. Fourth, the victim displayed a high level of certainty at the time of the show-up. And fifth, this Court finds that only a few hours had elapsed between the time of the victim's initial report to the police and the show-up at the Hingham Police Station. The totality of the circumstances all point towards the conclusion that the victim's identification of Mr. Delaney as her assailant is reliable and ought be admitted notwithstanding any sugestiveness at the time of the show-up. For the foregoing reasons, the defendant's motion to dismiss must be denied.

The defendant next seeks to have dismissed indictment nos. 75910-75912 which deal with various aspects of the stone-throwing incident. Since, on the evidence presented at a district court probable cause hearing, a judge of the district court found no probable cause on the charges that are presently contained in indictment nos. 75910-75912, and since the evidence presented before the Grand Jury was certainly no stronger - the defendant argues it was weaker-than the evidence presented to the district court judge, the defendant argues that the Grand Jury could not find probable cause to support these indictments and therefore must have been misled when it returned them, a matter which impairs the integrity of the Grand Jury proceedings. See, **Commonwealth v. Gibson,** 368 Mass. 518, 525 (1975). Since the defendant does not, nor could he, complain of the use of incompetent or inadmissible testimony before the Grand Jury here, Mass. R. Crim. P. 4(c), **Commonwealth v. Gibson,** supra at 522-525 (an indictment may be based solely on hearsay), and since it has been the long-standing rule that generally a "court will not inquire into the competency or sufficiency of the evidence before the Grand Jury", **Commonwealth v. Robinson,** 773 Mass. 591, 592 (1977), quoting **Commonwealth v. Galvin,** 323 Mass. 205, 211-212 (1948), this Court initially denied the defendant's motion to dismiss.

Then, on January 29, 1982, the Supreme Judicial Court issued its decision in **Commonwealth v. McCarthy,** 385 Mass. 160 (1982). That decision, while it reiterates the long-standing rules for reviewing the evidence before the Grand Jury, states in dicta, "We need not decide whether a Grand Jury must find a similar level of probable cause to that required in a preliminary hearing, see, **Commonwealth v. St. Pierre,** 377 Mass. 650, 656-657, & nn. 6 & 8 (1979)." Reference to Mr. Justice Kaplan's opinion in **St. Pierre** reveals that, again in dicta, the Supreme Judicial Court has suggested that an indictment based entirely on hearsay testimony might be vulnerable to attack "when the testimony fails to attain the level of the 'probable cause' needed to support an arrest or search warrant".

---

assailant's profile in numerous furtive glances") from which it might be inferred that, had the profile not been observed - as here - during the course of the assault, then a profile show-up ought not to be admitted, this Court does not so construe **Blaney**. Identification is not a matter of this or that aspect being presented as in an architectual drawing, rather, the reliability and admissibility of out-of-court identifications ought to be made from the totality of the circumstances and this Court does not conclude that the Appeals Court meant to suggest otherwise.

**Id.** at 656. Since **Myers v. Commonwealth,** 363 Mass. 843, 849 (1973), it has been clear that:

> [T]here is a "large difference" between probable cause to arrest ...and probable cause to bind over, "and therefore a like difference in the quanta and modes of proof..." **Brinegar v. The United States,** (338 U.S. 160, 173 1949...[T]he standard of probable cause to bind over must require a greater quantum of legally competent evidence than the probable cause to arrest finding to insure that the preliminary hearing's screening standard is defined in a way that effectuates its purpose.

Thus, while **St. Pierre** questioned an indictment based solely on hearsay testimony which failed as matter of law to attain the level of probable cause sufficient to make an arrest, **McCarthy** appears to go further and apparently raises a question about any indictment supported by evidence falling below the "level of probable cause...required in a preliminary hearing". **McCarthy, supra,** at 162, n.5.

Thus warned, this Court has proceeded to reconsider its earlier ruling and has engaged in a detailed review of the transcript of the Grand Jury hearing as well as a comparison of that transcript with the transcript of the hearing before the district court. **Galvin ·v. The Welch Manufacturing Co.,** Mass. Adv. Sh. (1981) 169, 173 ("A trial judge may act to reflect developments in the law which affect the correctness of determinations or rulings made by him"). The first question presented during such reconsideration is the deference owed by the parties, the Grand Jury, and perhaps this Court, to the ruling of the district court judge that no probable cause existed. Guided by **Myer v. Commonwealth, supra,** "It is within the discretion of the judge of the district court to determine if the evidence indicates that the defendant appears to be guilty. It is also within the discretion of the Court as to the amount of evidence

that it (sic) required by the Court before it it reaches its decision...[T]here is not available any judicial review as to the amount of evidence heard by the Court on a probable cause hearing". Smith, **Crim. Practice & Procedure,** 30 Mass. Prac. Series 341 (West Pub. Co. 1970). It is evident therefore that the ruling of the district court judge is something more than the judicial determination, for example, a motion for a directed verdict, **i.e.,** the legal determination that certain evidence either does not make out a prima facie case. Rather, the determination of the district court judge imports a certain fact finding process and is inevitably impressed, to a certain extent, with that judge's belief as to the credibility of the evidence presented to him. In such circumstances, his ruling is a mixed judgment of both fact and law and, since it has long been open to a district attorney to seek an indictment even after a finding of no probable cause, **Commonwealth v. Mahoney,** 331 Mass. 510 (1954), this Court concludes that neither it nor the Grand Jury is bound in any way by the prior determination of the district court adverse to the Commonwealth. At most, that determination forces the district attorney to have recourse to the Grand Jury if he wishes to pursue the matter.

Freed of the need to conform to the ruling of the district court judge, this Court's own analysis of the transcript of the Grand Jury proceedings convinces it that, while no eyewitness identification is definitely made out, a sufficiently strong circumstantial evidence case as to the questioned indictments was made out before the Grand Jury to pass muster even if the questions raised in **St. Pierre** and **McCarthy** were, in the future, to be imposed on the Grand Jury process as standards of evidence. Accordingly, even after reconsideration in light of **McCarthy,** the motion to dismiss the challenged indictments must be denied.

Finally, the defendant seeks to have the stone-throwing indictments, nos. 75910-75912, severed from the indictments

dealing with the incident on the ledges, nos. 75913-75914. As grounds, he asserts that he may wish to testify as to the stone-throwing matter but does not wish to take the stand concerning the incident on the ledges. "Whether two or more indictments shall be tried together rests in the sound discretion of the trial judge. **Commonwealth v. Jervis,** 638, 645 (1975). **Commonwealth v. Cruz,** 373 Mass. 676, 690 (1977)." **Commonwealth v. Egan,** Mass. App. Ct. Adv. Sh. (1981), 1900, 1907. Since evidence as to each of the offenses charged was connected with a single line of conduct, **Commonwealth v. Mahoney,** 348 Mass. 610, 614 (1965), **Commonwealth v. Cullinan,** Mass. App. Ct. Adv. Sh. (1981) 751, and since the outcome of the incident on the ledges bore on the motivation of the defendant to frighten the victim while she was riding with Mr. Donovan, it was appropriate to deny the motion for severance.

For the reasons expressed above, the motion to dismiss, the motion to sever, and the motion to suppress were all denied.

By the Court,
**William G. Young**
**Justice of the Superior Court**